**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Accordant Energy, LLC, | ) | CASE NO. 1:17 CV 411 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Vexor Technology, Inc., et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the Court upon Plaintiff Accordant Energy, LLC's Motion to Dismiss Vexor Technology, Inc.'s & Vexor Technology, LLC's Amended Inequitable Conduct Counterclaim and to Strike Affirmative Defense of Inequitable Conduct (Doc. 37). This is a patent infringement case. For the reasons that follow, the motion is GRANTED.

## FACTS

For purposes of ruling on the pending motion, the facts asserted in the amended counterclaim are presumed true.

1

Plaintiff Accordant Energy, LLC ("Accordant") filed this lawsuit against defendants, Vexor Technology, Inc. and Vexor Technology, LLC (collectively, "Vexor")[1] alleging patent infringement of United States Patent No. 9,062,268 (" '268 Patent") and United States Patent No. 9,523,051 (" '051 Patent"). The patents are both entitled "Engineered Fuel Feedstock."

Starting at least as early as 2003, Vexor began the research and development to create an engineered fuel product utilizing solid waste streams that otherwise hold no value and historically have been disposed of in landfills. Those solid waste streams include but are not limited to non-recyclable residue from material recovery facilities and virgin industrial waste streams. The resulting fuel can be used as a coal replacement for ceratin purposes.

By late 2005, Vexor had received customer approval to begin shipping its engineered fuel. By 2010, Vexor and/or its customers had received various awards related to the fuel. Due to is wide success, as of June of 2012, Vexor began looking for additional suppliers of feed stock material. According to the counterclaim, starting in 2012, Accordant[2] began supplying "MRF fluff" to Vexor, which is combined with "MRF fluff" from other suppliers plus the aforementioned industrial waste streams to form Vexor's engineered fuel. MRF fluff is the nonrecyclable residual material that forms 10-30% of the original waste stream received by material recovery facilities.

Ultimately, Vexor shared with Accordant certain proprietary information regarding its

---

[1] Two other Vexor related entities were initially named as parties, but subsequently dismissed by agreement of the parties.

[2] In actuality, it was ReCommunty, Accordant's predecessor, that first supplied the MRF fluff. For ease of reference, however, the Court will refer to ReCommunity as "Accordant."

2

fuel. Vexor alleges that the material was shared with the understanding that it would be maintained as confidential and used solely to further the parties' mutual beneficial relationship as feed stock supplier and fuel manufacturer. Approximately two years after Accordant received a sample of Vexor's engineered fuel, Accordant filed the application that resulted in the issuance of the '268 Patent. Thereafter, approximately two years following detailed discussions between the top-level executives of Vexor and Accordant, the application that resulted in the '051 Patent was filed. Vexor alleges that those applications were drafted specifically to broadly claim the process by which Vexor has been making its engineered fuel.

Accordant approached Vexor about licensing the processes covered by the patents-in-suit. Vexor responded that it has been using this process since long before Accordant filed its patent applications. Thereafter, Accordant filed the instant two-count patent infringement complaint against Vexor. In response, Vexor filed an amended answer containing a number of affirmative defenses, including the affirmative defense of inequitable conduct. In addition, Vexor filed an amended three-count counterclaim. Count one is a claim for invalidity. Count two is a claim for unenforceability based on inequitable conduct, and count three is a claim for non-infringement.

Accordant moves to dismiss count two and strike Vexor's affirmative defense of inequitable conduct. Vexor opposes the motion.

**ANALYSIS**

At the outset, the Court recognizes the Federal Circuit's aversion to unfounded inequitable conduct claims. *See*, *e.g.*, *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (opining that "the habit of charging inequitable conduct in almost every

3

major patent case has become an absolute plague"). Accordingly, litigants may not assert inequitable conduct without first establishing a solid factual foundation for the claim. *See id*. (counseling that "an unsupported charge of 'inequitable conduct in the Patent Office' is a negative contribution to the rightful administration of justice").

One way to implement the Federal Circuit's holdings in this regard is to rigorously enforce Fed. R. Civ. P. 9(b). Because inequitable conduct claims draw their essence from fraudulent conduct before the PTO, parties must plead inequitable conduct with particularity. *See Ferguson Beauregard v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003) (holding that "inequitable conduct, while a broader concept than fraud, must be pled with particularity"). The Federal Circuit has held that, "in pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).

> Although 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

*Id*. at 1328-29.

In this case, Vexor alleges that Accordant engaged in fraudulent conduct in prosecuting the patents-in-suit by making affirmative misrepresentations as well as omitting material information. The Court will address each type of alleged misconduct separately.

1. Material misrepresentations

Vexor alleges as follows:

4

> In response to the Examiner's rejection, the patentee argued that the Benson and Johnston patents teach HHV and O/C ranges that are outside of the amended claims. Additionally, one of the named inventors, Dingrong Bai, submitted a sworn declaration stating that (1) he was 'familiar with the disclosure' of the Benson and Johnston patents and (2) 'a skilled person reading Johnston would expect to produce a fuel pellet of at least 9,055 BTU/lb, which is above the claimed range of 3,000 BTU/lb to 8,000 BTU/lb.

(Doc. 29-1 at ¶ 66).

Vexor alleges that these statements are false because Benson and Johnston actually teach ranges that fall within the allowed claims. According to Vexor's allegations, Jonhston teaches that pelletized wood can have a heating value of less than 7,000 BTUs per pound and Benson teaches that MSW has a low average heating value of 4,000-5,000 BTUs and that Refuse Derived Fuel typically has a heat content of approximately 4,500 to 8,000 BTUs per pound. In addition, Vexor alleges that the fine processed RDF has a heat content value of 5,600 to 6,000 BTUs or further processed RDF has a heat content value of about 6,000 to 8,000 BTUs per pound.

In its motion to dismiss, Accordant argues that the allegations regarding the meaning of Benson and Johnston are simply inaccurate and not supported by a full reading of those patents. Accordant points out that the claimed invention in Benson involves "a solid fuel comprising a recycled lignin-comprising residue from anaerobic digestion of a ligno-cellulosic organic material which produces said recycled lignin-comprising residue with a heat content value of approximately 8,500 to 10,500 Btu/lb dry matter..." (Doc. 37-5; 8:51-58). In addition, Accordant points out that Johnston teaches that the fuel pellets that are the subject of the patent "generally have a gross heating value in excess of 9,000 BTU's per pound, and can have a gross heating value in excess of 10,000 BTU's per pound." (Doc. 37-4; 2:56-61). Thus, Accordant argues that it made no misstatements to the USPTO. Vexor does not respond to this argument.

5

Upon review, the Court finds that Vexor fails to state a claim for inequitable conduct based on any alleged material misrepresentation. As an initial matter, the Court finds that the only specific misrepresentation set forth in the amended counterclaim is the statement identified in the Bai declaration. Although Vexor alleges that "[i]n response to the Examiner's rejection, the patentee argued that the Benson and Johnston patents teach HHV and O/C ranges that are outside of the amended claims," this allegation does not specifically identify any particular misstatement appearing in the prosecution history or otherwise. Nor does Vexor identify which individual allegedly made this "argument." Rather, in Paragraph 54 of the amended counterclaim, Vexor identifies the "patentee" as *both* Ms. Calabrese and Dr. Bai. Yet Vexor fails to specifically identify which individual "argued" to the USPTO regarding the teachings of Benson and Johnston.

Vexor does, however, identify with particularly an allegedly false statement specifically made by Dr. Bai. Dr. Bai submitted a sworn declaration stating that (1) he was 'familiar with the disclosure' of the Benson and Johnston patents and (2) 'a skilled person reading Johnston would expect to produce a fuel pellet of at least 9,055 BTU/lb, which is above the claimed range of 3,000 BTU/lb to 8,000 BTU/lb. The Court notes that, although the amended counterclaim discusses both the Benson and Johnston references, the only statement made by Dr. Bai involves the Johnston patent.[3] As noted above, the Johnston patent does in fact teach that the fuel pellets that are the subject of the patent "generally have a gross heating value in excess of 9,000 BTU's per pound, and can have a gross heating value in excess of 10,000 BTU's per pound." (Doc. 37-

---

[3] Dr. Bai does aver that he is "familiar" with the Benson patent, but Vexor does not allege that this statement, in and of itself, is false or material.

4; 2:56-61). Vexor does not respond to Accordant's argument on this point. Although Johnston mentions that pelletized wood can have a heating value of less than 7,000 BTUs per pound, there is simply nothing in this cited portion of Johnston that renders Dr. Bai's statement false.

Regardless, Vexor falls far short of sufficiently identifying facts from which this court could reasonably infer that Dr. Bai knew of the falsity of the material misrepresentation and misrepresented this information with a specific intent to deceive the PTO. In support of its position, Vexor points to the following allegations:

> 60. Upon information and belief, the patentee and its counsel purposefully prosecuted the applications that resulted in the Asserted Patents through affirmative misrepresentation of material facts, failures to disclose material facts, and the submission of false information;
> 
> 61. The Accordant Patents claim priority to provisional patent application No. 61/076,020, which was filed on June 26, 2008. Between this provisional application and the applications that resulted in the Accordant Patents – applications No. 14/478,149, filed on September 5, 2014 and No. 14/715,384, filed on May 18, 2015 – patentee and its counsel submitted a series of continuation and continuation-in-part patent applications: Nos. 12/492,096, filed on June 25, 2009, 12/644/974, filed on December 22, 2009, and 13/708,532, filed on December 7, 2012;
> 
> 62. The prosecution history for just the application families that eventually resulted in the Accordant Patents spans well over 4,000 pages. This history reveals a complex and lengthy effort by the patentee to repeatedly narrow the claimed ranges, as well as add new claim range limitations, all in an effort to avoid a multitude of prior art references, even when such claim amendments had no novelty or tie to the original claims specification. Within the 096 application alone, the patentee amended or cancelled the original independent claims at least nine times before abandoning the application by failure to respond to an office action;
> 
> 63. Upon information and belief, the claims first submitted by the patentee for the 384 application (that resulted in the 051 patent) were identical to the claims the patentee submitted several years earlier with the 096 application. Not

7

surprisingly, these claims were again rejected by the examiner;

64. As with the 096 application, the patentee amended the claims to add new elements even though such elements had no novelty or tie to the original claims specification. Specifically, the independent claims were amended (or new independent claims added) to claim "a HHV of between about 3,000 BTU/lb and about 8,000 BTU/lb" and/or claim "an O/C ratio of between about 0.6 (w/w) and about 1.0 (w/w)[.]";

65. Upon information and belief, the examiner rejected these amended claims for reasons that included anticipatory and obviousness-based references found in Benson (U.S. Patent No. 5,429,645) and Johnston (U.S. Patent No. 4,236,897). The examiner had cited to at least the Johnston reference in notices of rejection for the earlier 096 application that was abandoned; and

90. Upon information and belief, Accordant utilized information obtained from public filings by Vexor and/or its customers to purposely draft patent claims broad enough to cover Vexor's manufacturing process in continuation applications filed long after the initial provisional patent application.

In essence, Vexor alleges that the "patentee and its counsel" submitted a series of continuation and continuation-in-part patent applications and the histories reveal a complex and lengthy effort by the patentee to repeatedly narrow the claimed ranges, as well as add new claim range limitations, all in an effort to avoid a multitude of prior art references. In addition, the patentee submitted previously rejected claims and added new elements even though such elements had no novelty or tie to the original claims. On the whole, the Court finds that these allegations fall far short of sufficiently alleging that Dr. Bai knew the statement about the Johnston reference contained in his affidavit was false *and* that Dr. Bai made the statement with the intent to deceive the USPTO. In fact, not one single allegation references Dr. Bai by name. The vast majority of the allegations involve commonplace occurrences within the patent world. Many patent prosecutions involve the submission of continuation applications with complex

histories. The allegations identified by Vexor, standing alone and in combination, do not satisfy *Exergen*'s stringent pleading requirements. Moreover, many of these allegations simply assert disagreement with the USPTO's conclusion regarding anticipation and obviousness. The Court finds that Vexor has not stated a claim for inequitable conduct based on any material misrepresentation.

    2. Material omissions

Vexor's claim for inequitable conduct based on material omissions fares worse. Here, Vexor alleges that there are three bases for its omission claims: the failure of the patentee and its counsel to disclose the "inherent teachings" of Morrison, which is prior art disclosed by Accordant to the USPTO; the decision by the patentee to insert into the application randomly determined ranges and ratios that were not tied to the original specification; and the failure to disclose Vexor's engineered fuel as prior art. Each alleged omission will be addressed in turn.

    A. Morrison

Accordant argues that a claim for inequitable conduct based on Morrison fails. According to Accordant, Vexor does not identify a specific person that omitted material information in connection with Morrision. Rather, the amended counterclaim asserts that "the Patentee and its counsel" engaged in wrongdoing, but the amended counterclaim does not identify any facts relating to any particular individual's conduct in this regard. In addition, Accordant argues that it did disclose Morrison to the USPTO and that the patents-in-suit clearly provide as such. In the alternative, Accordant argues that the "inherent" teachings of Morrison would have been available to the examiner through other materials. Accordant claims that two databases disclosed to the USPTO identify the elemental makeup of waste derived fuels. As

9

such, the "inherent" teachings of Morrison are cumulative to other materials available to the examiner and cannot form the basis of an inequitable conduct claim.

Vexor makes no specific argument directed at Morrison in response. Rather, Vexor generically argues that its allegations satisfy the pleading standard because they do, in fact, identify the "who, what, when, where, and how" of the material omissions. Specifically, Vexor argues:

> During the prosecution of the independent claims of [the applications] (the "when" and identification of the specific claims, see Dkt No. 29-1 at ¶¶74, 77, 81, 85), the inventors, the attorneys prosecuting the application, and/or others involved in strategy, preparation, or prosecution of the application (the "who," see id. at ¶¶54-58) knowingly and intentionally failed to disclose the inherent teaching of Morrison with respect to the naturally occurring ranges and ratios of carbon, hydrogen, oxygen, moisture, sulfur, chlorine, and volatile matter, as well as the heat value (in BTUs) of RDF ("what" was knowingly omitted, see id. at ¶¶ 34-50, 73, 79-81, and specific intent, see id. at ¶¶60-62, 71, 82-83, 90), which the examiner would have found either anticipated or rendered the subject matter of the 268 patent and the 051 patent ineligible for patent protection. ("but for" materiality, see id. at ¶¶72, 77-78, 82, 84-89).

Upon review, the Court finds that Vexor fails to state a claim for inequitable conduct based on any alleged failure on the part of Accordant to disclose the "inherent teachings" of Morrison. Here, it is undisputed that Accordant did in fact identify the Morrison reference during prosecution of the patents-in-suit. If an applicant discloses a prior art reference, the contents of the reference are presumed to be before the examiner. *See, McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 924 (Fed. Cir. 2007). This is so even if the "contents" of the reference are features inherent therein. *See, Avery Dennison Corp. v. Continental Datalabel*, Inc. 2010 WL 4932666 (N.D. Ill. Nov. 30, 2010)(finding supporting decisions persuasive in light of the fact that the Federal Circuit deems a patent examiner "to have experience in the field of the invention."). Here, because Accordant disclosed Morrison, the

examiner is presumed to have the inherent teachings contained therein and, as such, there is no "omission" on which to base an equitable conduct claim.

> B. Insertion of randomly determined ranges and ratios that were not tied to the original specification

Vexor also argues that it has stated a claim for inequitable conduct based on Accordant's insertion of various ranges and ratios into its patent applications. Although cryptic, it appears that Vexor is claiming that the ranges and ratios Accordant inserted occur naturally and are inherent properties. The Court finds that Vexor fails to state a claim for inequitable conduct by omission because Vexor alleges that Accordant did in fact disclose the specific ranges at issue. To the extent Vexor is somehow alleging that Accordant had a duty to disclose that the ranges occur naturally, the Court rejects the argument. As an initial mater, Vexor points to no allegation in the amended counterclaim that expressly alleges that its omission claim is based on this precise omission. Rather, in its brief, Vexor argues that Accordant "knowingly and intentionally added randomly determined ranges and ratios that had no tie to the original specification in order to cover the BTU range claimed in Johnston." (Doc. 40 at PageID 660). In addition, Vexor alleges that "typical ultimate-proximate analyses for the waste streams identified in Morrison and in RDF made from those streams fell within the ranges of carbon, hydrogen, and oxygen and other constituents identified in the independent claims..." (Doc. 40 at PageID 659, citing amended counterclaim ¶ 79). As Accordant points out, however, it did in fact disclose both Johnston and Morrison to the examiner. As set forth above, disclosure of those references necessarily includes disclosure of the inherent teachings contained therein. Because Vexor wholly fails to point to any specific omission on the part of Accordant regarding the express insertion of ranges, the Court finds that Vexor's inequitable conduct claim fails to state a

11

claim for which relief may be granted.

### C. Vexor's engineered fuel as prior art

In its brief in opposition, Vexor argues that it has stated a claim for inequitable conduct based on Accordant's failure to disclose the existence of Vexor's engineered fuel to the USTPO. According to Vexor, it is prior art that would have prevented the issuance of the patents-in-suit. Specifically, Vexor argues as follows:

> During prosecution of [the patent applications], the inventors, the patent attorneys, and/or other individuals involved in the strategy, or prosecution of those applications were aware that the claims being prosecuted read upon Vexor Engineered Fuel or that prior art Vexor Engineered Fuel was material to the patentability of the claims being prosecuted.

In addition, Vexor provides the Court with a paragraph containing information obtained during discovery that it claims establishes the plausibility of this claim.

In response, Accordant argues that this claim does not appear in the amended counterclaim. In addition, Accordant argues that the Court cannot consider Vexor's evidence at this stage in the litigation. Even so, Accordant disagrees with the statements and evidence upon which Vexor relies.

Upon review, the Court finds that Vexor fails to state an inequitable conduct claim based on the existence of Vexor Engineered Fuel or any failure to disclose the process to the USPTO. Although the amended counterclaim contains a heading "Inequitable Conduct During Prosecution of the Accordant Patents," there is no mention of the Vexor Engineered Fuel underneath that heading. Nor is there any allegation that Accordant failed to disclose the Vexor Engineered Fuel to the USPTO. In addition, to the extent the amended counterclaim could somehow be read to include an allegation that the Vexor engineered fuel constituted prior art that was not disclosed during prosecution, the amended complaint wholly fails to identify any

specific individual that was aware that Vexor's fuel constituted prior art at the time of the filing of the applications. Rather, the amended complaint generically refers to Accordant's predecessor, "top-level executives," "Accordant's attorney," or simply Accordant. *See, e.g.*, amended counterclaim at ¶¶ 20-30; 89-91; 105.  These allegations fall far short of identifying the "who" necessary to state an inequitable conduct claim under *Exergen*.

To the extent the amended counterclaim alleges that its inequitable conduct claim is based on Accordant purposefully drafting its patents to cover Vexor's process, the claim does not satisfy *Exergen*'s pleading requirements.  As set forth above, Vexor fails to identify any specific individual that engaged in this alleged wrongdoing. *See, e.g.*, amended counterclaim at ¶¶ 20-30; 89-91; 105.  The Court further notes that it will not consider any evidence on which Vexor relies in its brief in opposition.  As Vexor is surely aware, the Court cannot consider evidence when assessing a motion to dismiss.

D.  Affirmative defense

Accordant argues that, to the extent the Court dismisses the counterclaim for inequitable conduct, Vexor's affirmative defense of inequitable conduct also fails.  Vexor offers no response to this argument.  Having concluded that dismissal of the counterclaim is warranted, Vexor may not rely on inequitable conduct as an affirmative defense.

**CONCLUSION**

For the foregoing reasons, Plaintiff Accordant Energy, LLC's Motion to Dismiss Vexor Technology, Inc.'s & Vexor Technology, LLC's Amended Inequitable Conduct Counterclaim and to Strike Affirmative Defense of Inequitable Conduct (Doc. 37) is GRANTED.

13

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan  
PATRICIA A. GAUGHAN  
United States District Judge  
Chief Judge

Dated: 9/19/17